My name is Kristen Boyles, and I represent the Commercial Fishing and Environmental Appellants in this case, and I'd like to save three minutes of my time for rebuttal. Before I turn to the three points that I want to make this morning, I'd like to briefly outline what's at issue at this appeal and what is not. The Klamath Irrigation Project Biological Opinion covers ten years of operation of a project by the Bureau of Reclamation that controls the river flows in the Klamath River and controls the amount of water that's left in that river for fish, and specifically here for threatened coho salmon. Because the National Marine Fisheries Service found that the Bureau of Reclamation's proposed action would jeopardize the coho, the Biological Opinion contains a reasonable and prudent alternative which is broken into three parts or phases, and the phases that are at issue here are phases one and two, which are called variously in the briefs the short-term flows or the short-term measures. Phase three is not at issue. The district court found that that phase violated the Endangered Species Act. The district court also found the incidental take statement that violated the Endangered Species Act, and those issues are not on appeal here. There's no cross-appeal on that? There's no cross-appeal. The government did file one, but then dismissed it. The short-term phases, then, are invalid for three reasons. First, the Endangered Species Act requires the Bureau to mitigate for all the jeopardy that its action will cause and does not allow the fisheries service to approve an action where the long-term measures may prevent jeopardy, but the short-term measures will not. Second, there is no evidence in the administrative record to support the short-term flows or the phased approach. In fact, the evidence that is there shows that the fisheries service refused to undertake the necessary analysis. And third, both the district court and the Federal defendants here incorrectly rely on implicit reasoning to support the phased approach and the short-term flows, and under the Administrative Procedure Act, implicit reasoning cannot take the place of explicit analysis. Could I ask just a fact question? The district court clearly relies heavily on this water bank. Could you just explain how the water bank physically will operate under the presumption of the proposed plan? I can explain how it's set up, and perhaps Federal defendants can tell you exactly how it operates. It is set up in the year, it is set up to provide an increasing amount of water which the farmers apply for in order that they will not use that water for the particular year. They are paid not to irrigate and tend that water. And is that water accumulated then behind the dam? Or is it upstream from the dam? It's an open question where that water is kept because of the way the system works. There's not a lot of storage possibilities. One of our concerns is the water bank water is used in unspecified ways. And according to the biological opinion, it can be used at different times of year. It's unclear how it is accounted for when it is used. But it is part of the measures that are required by the RPA. Okay. And does VOR release on demand or under obligation from various times from the dam for various reasons? The irrigation season in the Klamath starts on April 1st, and the irrigation supply is then controlled by the Bureau of Reclamation. And then they make record, if they've got multiple obligations to various parties when they make these releases, are they making records of how much has been released at any given time? No. That record does not exist. It is more of a day-to-day operational as far as we can tell from what we look at at the record. I'm almost done. I'm just trying to figure out how one charges water bank and the extent to which it will supplement the flow and then be accounted for. I'm not trying to duck the question here. I don't know, and I'm not sure anyone knows. One of the concerns about the water bank is how is it accounted for? When is it used? How do you know it's been used? How is it, because you can't actually bank this water, how is it going to be augmenting the flows that are issued? And what agricultural use is the water put to? I think it varies from year to year in the upper Klamath. There's a great deal of potatoes that are grown, and horseradish was one crop, and I'm not the person to speak to that. I see. I want to turn to my first point, that these phases violate the Endangered Species Act, for this is the legal point at issue here. Although the Fisheries Service integrated conflicting science to arrive at acceptable in-river flows to prevent jeopardy, the agency then discarded those flows for the first eight years of this biological opinion. The final biological opinion, that's at Excerpt of Record, page 200, the Fisheries Service found that 57 percent, that's the percentage we're talking about here, of the long-term flows may not avoid jeopardy. But the ultimate conclusion was that for these first two phases, they were going to ignore that finding. Phase I flows do not even reach the 57 percent level. They are, in fact, the jeopardizing flows that were originally proposed by the Bureau, plus the water bank water, which is used, again, in unspecified ways. The Phase II flows are the inadequate 57 percent flows. There are two separate but related legal problems, then, with this analysis or this conclusion. The Endangered Species Act requires the Bureau to mitigate for all the jeopardy that its action will cause, and that hasn't been done. Additionally, the Endangered Species Act does not allow the Fisheries Service to approve an action whose measures will not prevent jeopardy in the short term. Which brings me to my second point. It would be possible, I think we can imagine a scenario, to have a short-term flow regime and a phased approach if these measures had scientific support that showed they were going to prevent jeopardy, which is what we don't have here. The eight-year delay to attaining the flows necessary to prevent jeopardy was never analyzed by the Fisheries Service or the Bureau, and there's nothing in the record to support their decision. I know I saw this, and I think I've got a pretty good idea, but you may be able to help me. What is the generational life cycle of a coho? That is to say, I think is it three years? It's three years, Your Honor. Sometimes two. So we've got eight years of inadequate flows. We're talking about almost three generations' worth. Two whole generations and three egg life cycles. So you're affecting a population beyond just the years that you're talking about, one set of years. And we're talking about an endangered species that if they die out, they're not coming back ten years from now. That's absolutely right, Your Honor. And that's one of the reasons why it's so important that the short-term flows, the short-term regime prevents jeopardy as well as the long-term regime because it doesn't make any logical sense, let alone legal sense, that we can sort of wait to get what we need until the year 2011. The final bilateral opinion does not contain the analysis necessary. While the best available science may have been unsettled at the time, the fishery service itself integrated that science, considered the National Research Council interim report and Dr. Hardy's studies. The service used this scientific integration to develop the flows to prevent jeopardy, and those are the flows that are not being met for the first eight years. We can look at the draft biological opinions, which are in the record. Each of those analyzed in-stream flows and came up with recommendations that would require, that would, excuse me, that would prevent jeopardy. They contain neither a phased approach nor this 57 percent requirement. And the final biological opinion is where we get the change, and it is, there is no explanation in the record for how we get from one set of recommendations which would require these flows to be implemented immediately, and a final set of recommendations which has the delay. In fact the Just in terms of jumping ahead, and I don't want to push you way off your argument, but assuming that you are correct, what is the relief then? What happens in your vision that should be imposed during Phase I and Phase II, and who pays the price of the shifting of the water away from the river? Under the record that we have now, what should have happened was when the Fisheries Service decided that here are the flows that are necessary to prevent jeopardy, the long-term flows, those flows should have been in place right away. There will always be continuing science and continuing refinement of direction, and that's allowed for under the Endangered Species Act and, in fact, encouraged. But the legal and logical requirements of this analysis would require those flows to be met immediately. I'm sorry. You said this and it went past me. You say those flows. Which flows now? The long-term flows, Your Honor. I'm sorry. What are called the long-term flows. It's odd to call them the long-term flows because initially they were going to be the required flows. And by long-term flows you mean the 57 percent plus the 43 percent? I mean the flows that are going to be met in 2011, yes, Your Honor. The flows that they promised to meet from the unspecified 43 percent additional? That's correct. That's correct. So in your view, if you're right, if we agree with you as to Phases I and II, the appropriate remedy is for the district court to order full flows now until an appropriate RPA is done that might allow a different determination? That would certainly be that we would certainly agree with that, Your Honor. We have actually not asked for an injunction. Well, we didn't, Your Honor, we didn't actually ask for an injunction from this court. We asked that it be remanded to the district court to enter appropriate junctive relief. That would be my starting point. We knew this appeal would take some time. We had assumed there would be more science that came out in the meantime, and there has been additional studies. And so I wouldn't want to have the court in the position of prejudging the science that exists now in 2005. In 2002, when this biological opinion was issued, the correct result would have been the long-term, the final flows to be implemented immediately. And I still believe that that may be where we are, but that issue has not been briefed before this Court. Okay. Thank you. That was helpful. Back to what is in the record, and this perhaps goes to your question, Your Honor. The Bureau's position was that it could not meet the 100 percent flows because it would not allow the project to operate in a manner consistent with its intended purposes. So it would not allow it to meet, I want to assume by that, all of its water contracts all the time. There are two problems with this reasoning. First, there's no evidence in the record to support the Bureau's claim. And second, if this were true, then the solution under the Endangered Species Act is not to shortchange the species, and it's not to issue a biologically inadequate biological opinion, but it is to seek an exemption from the Endangered Species Committee. There is an avenue for addressing areas where sort of things are mutually incompatible. We haven't gotten there yet, but the leaping to coming up with a solution which actually doesn't meet the requirements of science or the law isn't the answer. Can you help me understand the following? It may be that this question is better directed to the government. What's the nature of the obligation that the Bureau of Reclamation has to its water users? Is it contractual? Do they have an escape hatch? Do they simply breach the contract and say we're immune and you can't sue us? I mean, can you describe those obligations? Not particularly well, Your Honor. They have a contractual obligation. There are solicitor's opinions from the mid-'90s which talk about the Bureau's duties that follow in order, tribal and trust treaty right duties to provide water, Endangered Species Act duties, then contract duties. So they have recognized an order for that. And that is in the excerpts of records, the solicitor's opinions. But I think perhaps the government's in a better position. Let me just ask along the same lines that Judge Fletcher asked. Now, under Section 7 of the Endangered Species Act, it seems to me that the Bureau of Reclamation has to follow the orders, unless it does so in an arbitrary and capricious manner. And how does the reliance here meet that standard? I'm sorry, Your Honor, that the Bureau of Reclamation has to follow the orders  It was just following orders. It was told what to do. And it's allowed to rely, as I understand it, and I'm not sure I understand it, on the RPAs unless doing so would be an arbitrary and capricious act. Here it appeared that they were just following the RPAs. What was arbitrary, capricious about what the Bureau of Reclamation was doing? Your Honor, our challenge is mainly toward the National Marine Fisheries Service RPA, and that the RPA itself is invalid. If we are right in that, then the Bureau of Reclamation has acted incorrectly as well. So in terms of that, it's tiered duties. But what if it doesn't know it's invalid? I mean, until we proclaim it, if we do, then it's invalid. At the moment, Your Honor, it's not invalid. I think you're right. I mean, I think they have that's why I'm asking. It's not really acting in an arbitrary and capricious way, are they? The Bureau may not be acting in an arbitrary or capricious way, but we believe the National Marine Fisheries Service certainly is. Yes. I'm just trying to separate the two. Yes. And I think it's also incorrect to sort of characterize the Bureau on the facts of this case as being sort of a bystander to which this was handed and they must follow. The evidence and the record shows a great deal of back and forth between the National Marine Fisheries Service and the Bureau. And, in fact, the final biological opinion says National Marine Fisheries Service submitted their proposal of what would be the reasonable and prudent alternative and the Bureau said no. It wasn't going to follow that. It didn't accept that. And that's where we ended up with the phased approach and the 57 percent requirement from the Bureau. That comes from meetings in April, late April 2002, between the National Marine Fisheries Service and the Bureau. And it is that point in the record that you no longer have any analysis of what's going on. Help me understand what I'm supposed to do. I'm even at a loss for words, but I guess the word might be procedurally. What am I supposed to do procedurally with the evidence from Mr. Kelly? The evidence from Mr. Kelly is, Your Honor, is in this case. The district court allowed us to take his deposition. The district court considered his deposition testimony. It's discussed in the opinion in footnote, one of the footnotes. It's either 6 or 9. And Mr. Kelly's was considered supplementing the record. The order from the district court magistrate, actually, letting us take the deposition of Mr. Kelly says this is the kind of information that is supposed to be used for supplementing the record when you have gaps in the record like we have here. And his testimony underscores everything I've just we've just been talking about. It's not necessary to have his testimony, but it shows what was actually happening. It shows that, in fact, the scientists at the Fisheries Service were told after the Fisheries Service and the Bureau, there was going to be no more analysis. This was the solution that was going to be taken, taken care of and put into the final biological opinion. And so his testimony is very clear on that fact. And I think that until it was raised in the briefs here, there was never any question that that testimony was record evidence just like any other evidence was. Turning briefly to my third point, the district court found that the analysis necessary to support the short-term flows and the phased approach was not in the biological opinion. That's in her order at excerpt of record page 385. The court then erred by finding that implicit in their analysis was the fact that the phased approach must not jeopardize the salmon. That's exactly what the district court couldn't have found. The agency's missing analysis and reasoning cannot be implicit in this kind of case. It needs to be explicit. The Federal defendants make a similar mistake here, arguing that their reasoning must have been inherent. They would not have adopted a phased approach if it was going to jeopardize the salmon. But, again, that is entirely circular reasoning as far as whether these two phases that we're talking about meet the requirements of the Endangered Species Act. Kennedy. If the reasoning is fairly evident, though, we do have cases that suggest that if they don't lay it out precisely, but it's quite evident. Why isn't that the case here? It's not the case here because it's not, there is no, there isn't that reasoning in the record. And if you, I invite the Court to look closely at the biological opinion. The pages that are most important as where the government points to its reasoning being, excuse me, there, would be in the final biological opinion at Excerpt of Records pages 197 to 208. Those pages do not contain that reasoning. They contain a description of what the phases are. A description is not analysis. And they, if you compare that then with the detailed discussion of Phase 3, where we finally would eventually get to the full flows on the following pages, you can see the difference. In this case, we don't have the reasoning to support the phased approach. And as the district court found, that there was no explicit reasoning to support the phased approach, and yet that it must be there. This Court, as recently as the Gifford-Pinchot Task Force case, has said that a phased approach must be explicitly analyzed by the agency. In fact, to a certain extent, there's an irreconcilable conflict between the district court's findings that the end result, Phase 3, violated the Endangered Species Act, and yet Phases 1 and 2 didn't. You know, we're sort of struck with where are we now in the middle of this process. Your Honors, we would ask the Court to find that Phases 1 and 2 of the biological opinion are invalid, to set them aside, and to remand the case to the district court to enter the appropriate injunctive relief. And I'll save the remainder of my time. Roberts. May it please the Court. My name is John Bryson on behalf of the Federal Appellees here. I'm going to take 16 minutes of the 20 minutes, and Mr. Robin Rivett, who represents the intervener, Klamath, water users, would take the remainder of time. And it's our submission here that the plaintiffs have failed to show that the reasonable and prudent alternative provided in the biological opinion was arbitrary, capricious, but of use of discretion or contrary to law. Contrary to the submissions of the plaintiffs, the argument of the plaintiffs here, what the biological opinion has expressed findings that this is an RPA that would avoid jeopardy, which includes all of its phases. And that's excerpt of Record 197. And excerpt of Record 201, we have the express conclusion that NIFS thinks the approach contained in the RPA sufficiently addresses the adverse effects of the Klamath project on the salmon. That's the conclusion, though. Well, that's – and that is backed up by the analysis of the development of the RPA and why it works. And it's based on the fundamental premise that NIFS recognized that the National Research Council's report supplied the best scientific evidence, and the conclusion of the National Research Council was that there was not a scientific justification for particular flows. NIFS made a determination here that there isn't evidence to establish a specific target for flows. What it said was we need to do a lot more study. And they developed this approach with the Bureau of Reclamation, which a consultation requires two parties here, Your Honor. It's no sin for them to listen to the Bureau of Reclamation and understand what's going to work and what's not going to work. How can it be that the district judge is right as to Phase 3? Well, Your Honor, there's an important distinction there. Wait a minute. But that you're right as to the preceding phases. Okay. I would understand your position better if you'd maintained your cross-appeal. Yeah. Well, Your Honor, the – what the district court did was it's not – it's an overstatement to say that she invalidated Phase 3 in its entirety. She rejected the plaintiff's contention that the flows that were established as the targets were not – were arbitrary and capricious. So that is the same. Which flows now? These are the ultimate flows to be met after 10 years. The 57 plus 43. Right. Exactly. The only thing she invalidated was the way that the RPI was restructured in order to achieve those flows by the tenth year. And that does not necessarily require that she invalidate Phase 1 and 2. And that's really not their argument here. Their argument here is that there wasn't any finding as to Phase 1 and 2. And secondly, that on the basis of Mr. Kelly's evidence, that in order to do that finding, NIPS had to undertake this quantitative analysis of what the water bank would do. And our submission shows that the NIPS actually made the findings as to all phases, and that in view of the fact that the best scientific evidence said that you couldn't develop numerical targets with any absolute certainty, that it was non-abusive discretion for NIPS to say the water bank will buffer the required flows in the short run and avoid the problem that the National Research Council said. And that's their case. Can you answer the question that the other side had a little trouble with? What's the nature of the contractual obligation or other obligation, whether contractual or otherwise, that the Bureau of Reclamation has to the water users? Well, it is by contract, Your Honor. That much I know. In the record, in our supplemental extractive record, is the biological assessment that the Bureau of Reclamation submitted to NIPS. And it has a background section which describes the structure of the project and the legal basis, and it's by contract. Now, I do not know for certain what happens, how it's administered, and what happens if, you know, whether there's a certain amount of water that's contractually required but is subject to what the water year is and how that's sorted out. I see. And whether, you know, if someone thinks there's a breach in the contract, where their remedy is. Can you tell me what the water is used for? Does it say what crops are grown and so on? It's irrigation water for agriculture. That I know. Beyond that, I don't know the exact. Okay. They described, I think I just saw a description of haymaking was one possible crop. But I think there are others. I think potatoes is one, as I believe the counsel mentioned. But I don't know the details, Your Honor. I want to go back to, if I may, to Phase 1. Now, didn't NIRNS find in the biological opinion that the flows in the biological assessment would jeopardize the salmon? Now, does the biological opinion explain how the RPA avoids jeopardy during Phase 1? Yes. Years 2002 to 2005, and, you know, the Bureau of Reclamation must also build a water bank and release this water in an amount ranging from 30,000 to 100,000 total acre feet, et cetera. Are you contending that adding water from the water bank, wherever it may be and whatever it is, that avoids depleting the average flow in Phase 1? Yes, because what NIRNS found was that the water bank will operate as the buffer, preventing the average in that short period of time, preventing any depletions because of the way the biological assessment flows were structured. And that is that language. Let's see. I'm sorry about that. The buffer language is on page 198, Your Honor, at the bottom of the last paragraph. Further, MIPS thinks that this RPA is consistent with the findings of the NRC interim report because it provides for use of the water bank to buffer against allowing average flows to decline below those of the reference period. Now, I'm sorry. I should have been following along. Could you help me through the excerpts again to find where you're going? Excerpt from Record 198. ER 198? Right, Your Honor. Because the jeopardy basis was a very narrow one, which was that the best science, which was the NRC report, said that what flows, there was no basis for any increase in flows over a historical period.  MIPS did an analysis simply for the spring months because that was the most important area that they thought, and they said, well, the biological assessment, the Bureau of Reclamation's flows, will lead to declines over a 10-year period from the flows for the reference period. So it was on that basis that jeopardy was found. In the RPA here on 198, they say MIPS thinks this RPA is consistent with the NRC's recommendation because it provides for use of the water bank to buffer against allowing the average flows to decline. So they made an express finding that that's how, in the Phase I, they're going to avoid the problem presented by the biological assessment. All right. Now, where does the biological opinion explain how providing 57 percent or less of a long-term flow will ensure the long-term survival of the cohort? Well, the premise of the biological opinion is that you have to have 100 percent of the flows. That's what they say here. They say that on page 200 of the biological opinion, MIPS, in the middle, second full paragraph, MIPS pointed out that establishing flows of only 57 percent may not avoid jeopardy over the 10-year period and that the structure of the RPA was changed to assure the 100 percent of those flows. MIPS's decision is that eventually, at 10 years, you have to have 100 percent of these flows or whatever flows are determined as a result of all the studies that they want to have done, because ultimately it all boils down to the fact that MIPS had to make its own qualitative judgment here because the science did not supply a numerical answer and it did not have a scientific basis for saying that X amount of flows are going to help a fish who uses the main stem for migration but spawns in the tributaries. There's nothing that the Bureau of Reclamation can do in the tributaries. All they can do is supply water to go down the main stem. Now, the 57 percent figure seems to me, and I may be wrong, is calculated on the basis of the acreage of land in the basin that the project irrigates. It seems to me the number is not related in any meaningful way to the quantity of water necessary for the fish to survive. Well, Your Honor, it doesn't have to be. That's MIPS's. Because MIPS has made the judgment that the RPA, in order to avoid jeopardy over a 10-year period, has to meet the 100 percent of the flows. Now, the structure here has said, well, the Bureau of Reclamation would be directly responsible for 57 percent, but it had to use its authorities to obtain the other 43 percent. And if it didn't, and if it was not able to do that, it would have to reinitiate consultation. So the 57 percent figure doesn't have to, by itself, guarantee the survival of the fish, and that's not what MIPS found. So that's not what we're defending, anything of that nature. And what MIPS found was that 100 percent was necessary, and this is how it could be gotten. Now, the fact that the district court said, well, you can't rely without a further showing on the availability of that other 43 percent through those mechanisms doesn't mean that it means that the first phases are arbitrarily precious. How do you respond? Are you done? I didn't mean to cut you off. I believe you're open. Okay. If I could, I just want to pick up and make sure you address the response to counsel's argument that, on its face, the district court has let you all off the hook by finding implicit, rather than explicit, your explication of the rationale for phases 1 and 2, and I think some justification compares phase 3, where there's a lot of detail, but not so much in phases 1 and 2. What's the why isn't that a failure on the part of MIPS, and what would, that's part A, and then what would be filled in if it were done explicitly? Well, Your Honor, I think the district court used the phrase implicit. We don't actually think it was implicit. We think it's explicit, because there is a, the analysis of the RPA begins at page 197 in the ERA, and it begins with a paragraph that says, MIPS and reclamation have identified one reasonable and prudent alternative which MIPS believes meets the criteria, which is that there be, it would avoid jeopardy. And then when, several pages later, page 201, there's MIPS' conclusion that the approach of this RPA, the phased approach, will, sufficiently addresses the adverse effects of the climate project. Now, Well, those are the two conclusions connected by a lot of description of process. Well, it's not description. It's description, analysis of the NRC report, what kind of quandary that placed MIPS in, which is that there isn't any scientific basis for particular flows. So there is not a, you can't, MIPS couldn't, was not required to base the RPA entirely on the supposition that the more water will always benefit the fish. I mean, that was not established. So you're saying that the science, they did the best with the science available at the time. That's right. But they chose to take a precautionary approach to provide additional flows in the spring months when the smolts are migrating out to sea and when the newly hatched salmon are looking for a place to be in the river. And then they took a precautionary approach to provide more flows because they relied on their professional judgment that this would be a good idea. But they also found that in the interim, in order to develop all this studying, they would require the Bureau to take those steps and to have the water bank. And the water bank, there's an explicit statement here that it responds to the NRC's conclusion by saying that that will buffer the declining possibility that the averages would decline over time. And then as the water, you heard my question about it. I just want to make sure I'm understanding how this water bank works. I'm afraid since it was not an issue in this case. I mean, the plaintiffs here say they expressed concerns, but they never put an issue to the case about whether the water bank was going to work or how it was going to work. So I don't have a lot of concrete information. But I do know that it requires farmers, people who are entitled to water, to give up their entitlement so the water stays in the system. Okay. And they also, I think, rely on groundwater pumping. So I think additional water is put into the system. Now, I don't know, I mean, there's not a huge reservoir. That's what I'm trying to figure out. But there are ways of, you know, putting water into the river. And that's how. And the releases, the flows are based on releases at the Iron Gate Dam. And so that's. But is it put into the river upstream of the dam and through groundwater? I don't know whether it's upstream of the dam or right below the dam, but it's at that point. That's where they measure. So they can actually put water into the main stem of the river below the dam, but from alternate sources? I'm not sure. I don't know. I don't know an exact technical explanation of that. This is kind of an elementary and I think potentially a stupid question. I have trouble getting past the notion that the government has determined that 10 years down the road a certain flow of water is necessary. But getting to that point for phase one, you don't quite have to come up to 57 percent. And phase two, you have to have 57 percent of that time. How can it be simultaneously true that 10 years down the road you need a certain flow? But leading up to that time, you don't need anything near that amount. Okay. Well, Your Honor, what NISP determined was that it had to have planning targets. What it set up were planning targets for the 10th year. And they will be the required flows unless there is. You're not quite to my question yet. That is to say, I think the premise of the water flow required at year 10 is that that's the amount of water reasonably necessary to ensure survival of the fish. Is that right or is that wrong? It's NISP's conclusion based on their best professional judgment that having that amount of water in the 10th year would avoid jeopardy based on what they know now. Okay. So far, so good. Well, given that these fish don't stay in the ocean for 20 years but come up after a three-year life cycle from hatching to spawning. Right, Your Honor. We put several generations of fish into a river that has nowhere near that amount of water. How can that be true? How can the later amount of water required be true, and yet for 10 years we don't provide anything near that amount of water through several generations of fish? I think the answer, Your Honor, is that the impacts on the fish come from lots of different sources. And what we're talking about is the amount of water that's in the main stem of the Klamath. Well, of course. Right, Your Honor. But they don't spawn in the main stem. They spawn in the tributaries. The National Research Council's — This strikes me as if I can use the phrase a red herring. The only thing that you're being asked to do is to provide water in the main stem. And the hypothesis or the premise behind the water flow in year 10 is water in the main stem. And I'm asking you, how can that amount of water be required in the main stem at year 10, and yet you maintain nonetheless you don't have to require anything near that amount in the main stem in years 0 through 10? Okay, Your Honor. Well, if you read carefully the National Research Council report, one important conclusion they reached was that providing more water in the main stem would not necessarily have a beneficial impact on the fish because they seem to be saturated. In other words, for the amount of fish that have been coming through historically in the last several years, there's enough water there for that phase of their life. The problem is that there's not water or suitable habitat in the tributaries. Well, you're back on the same irrelevant point then. I mean, if that's the problem, why are we even here as to year 10? We are not addressing a problem in the tributaries. The only problem that's ever been in front of us is what's the water that's coming down the main stem? I understand there may be a problem in the tributaries, but that's not the problem in front of us. What is the year 10 solved that isn't being solved now? Well, the year 10 flows in NMSA's professional judgment was that it would add more water in the spring to facilitate this migration of the smolts out. To get them to the tributaries? No, they're going out to sea. When they're coming down. Yes, coming down. So what's going to happen in year 10 in the tributaries that's going to make the increased flows more relevant then than they are now? I think I'm trying to get to the same issue. Well, I think, I mean, I agree with Your Honor that what's before us is the main stem flow, because that's the only thing the Bureau can control. So I guess it's a way of saying that the solution for this fish cannot come exclusively from the Bureau of Reclamation. And, you know, we are here deciding what the Bureau, whether what the Bureau does will avoid jeopardy. We've prevented you, despite your best efforts, from saving four minutes for your co-counsel. Four minutes. Okay. Thank you, Your Honor. Thank you, Your Honor. Robin Ribbett for the Klamath Water Users Association. I'd like to real quickly get to these specific questions that you asked and maybe answer them a little bit differently. First of all, the Bureau of Reclamation, when it's releasing waters, when it has a water bank, what it's doing is it's taking water that is contracted for various parties, and the parties, the farmers themselves, are releasing themselves from that water. So that additional water is in the flow. Also, there is, they are alternatively pumping water out so they don't need as much water, so that water is banked to go down the stream. That's what the water bank does, in essence. Where is it banked? It's just banked in the system. It doesn't go to the river. It's just the system itself. Now, in the system meaning lower Klamath Lake? The lower Klamath Lake, the upper Klamath Lake, exactly right. It's in those lakes, and it's not diverted, as it would be under the contracts. It's not diverted to the farmers for them to grow potatoes and radishes and hay and all these other kinds of crops, and it's not diverted also to the wildlife refuges, which need that water and comes from the system as well. Now, getting back to this question of the RPA, it would have been perfectly all right for the National Marine Fisheries Service to rely upon the NRC study to develop its RPAs. It would have been perfectly all right for them to have had the flows that NRC said were adequate under the best available scientific and commercial data. They didn't do that. They decided they were going to ratchet up the RPA. They were going to be more prudent, and they were going to be very conservative, so they decided to ratchet it up. They could have maintained the flows, these short-term flows that we've been talking about, for 10 years. That would have not been a violation of the ESA. That would have been an adequate RPA. They decided that they were going to ratchet that up so that by year 9 and 10, they had additional flows going down the system. So they looked at the NRC report. They looked at the Hardy 2 report. These are two reports that you'll see in the biological opinion discussed quite extensively, and they said, okay, the best available science that the lower court recognized was NRC, but we also see that the Hardy 2 report says that we should be ratcheting up the water flow a little bit. So we're going to err on that side if there's any side to err on. We're going to err on the fish side. So we're going to make sure that we have that water available by the 9th and the 10th year. We may not need it for an RPA early on, and we don't need it for an RPA early on because NRC has told us we don't need that. That's the best available science. But we want to make sure that we protect the species. So they ratcheted it up so that they had more water in years 9 and 10. That's the big difference there. Now, if you take a look at a wonderful case by analogy, a great analog case, is the case that both sides have analyzed here with regard to Lake Mead. The Lake Mead case, which is Southwest Center for Biological Diversity versus the National Marine Fisheries Service is another issue where you had water was low in Lake Mead.  Because they didn't have the water supply. But when the water supply was there, it was available, the Bureau of Reclamation was raising the water. But in the meantime, there had been some habitat for the southwestern willow flycatcher that had developed in that area. So the argument was that you could not do that without taking the species, so they entered into an RPA for that as well. They went through the biological opinion. They developed a reasonable and prudent alternative. That reasonable and prudent alternative was to not raise the water much more. Bureau of Reclamation, very much like here, said, wait a minute. We're not going to be able to accomplish the goals of the project if we do that. We've got to raise the water because we have a lot of contracts. We have a lot of needs for that water. But we'll go outside and we will buy habitat elsewhere. Here's a situation where they actually had, you know, they went and they had a phased approach. They bought habitat along a phased approach. And the argument was that this phase is inadequate. The same thing is happening here. We have the same kind of phased approach. We have a phased approach where you have flows which are maintained and they're adequate under the RPA, under the NRC's studies. There are flows that are adequate for the first three years. They keep ratcheting up. You have 30,000 acre feet the first year in the water bank. You had 50,000 feet, 75,000 feet. This year you have 100,000 acre feet of additional water, which is going down the system, to make sure that what the NRC said is a concern, is that you don't have the water flows themselves getting down to a lower level than was, and I'll be done in just a second here, Your Honor, a lower level than that was anticipated by NRC, which was adequate, which was the average amount from 1990 to 2000. Thank you very much. I think you saved just under two minutes. I'll try not to talk too fast. I just want to have one factual clarification before I have four brief points. Judge Fischer, the water goes in upstream of Iron Gate Dam, and it's up in the project. The Iron Gate Dam represents the farthest upstream point Coho can get, so that's where the water is put in. Four points then briefly. The water bank water that is augmented in this phase one does not even reach the 57% level. I mean, it is a lower amount than the 57% level that NMF said causes jeopardy to Coho, and that's the excerpt from the record at page 200. So the water bank water, while I'm happy it's there, I'm hoping it's doing good, it does not get us anywhere close to the 100% that NMF has ultimately said is needed. It is odd that my colleague keeps saying that there's no scientific basis for particular flows when NMF did come up with a number for particular flows in year 10, and that is excerpt of record page 215. Those flows represent NMF's view of the science looking at all the studies that are available out there, the NRC interim report, the Hardy flow studies. It recommended long-term flows. It's the backing off of those long-term flows for the first eight years that we are challenging and we believe is incorrect. Third, Mr. Bryson said that 100% is necessary, and the answer to Judge Nelson, your question about where does 57% come from, he says, well, 100%, we have to get to 100%. Again, you're not going to get to 100% until 2011. There's a lot of years between now and then that aren't going to be at 100%. They're going to be at 57%, and there's no analysis in the record that shows that those aren't, those years are going to have enough water to not have jeopardy. NMF's called jeopardy on this proposed action and has reasonable and prudent alternative flows for this proposed action. The other activities discussed by Mr. Bryson are in the baseline. They are already part, they are not considered in this, what they're going to require, NMF's is going to require the Bureau to do. So questions about the tributaries and other impacts, they are considered in the baseline, not in the flow recommendations. The baseline is at the excerpts of record, page 165 to 177. And finally, with respect to Lake Mead, which is discussed at length in the briefs, that was a four-year biological opinion with a four-year phase in. Fish and Wildlife Service analyzed each phase and found that each phase was not going to cause jeopardy. We don't have that here. What we have here is said is more analogous to this Court's decision in PCFFA v. NMF's, which rejected a biological opinion which disregarded short-term impacts. Thank you very much. Thank you. Thank you. Thank you very much. We've had a series of interesting cases and good arguments today, including this one. Thank you very much. Thank you. The last case on the calendar, Pacific Coast Federation of Fishermen's Associations v. U.S. Bureau of Reclamation, is now submitted for decision and we're in adjournment. Thank you very much.
judges: D.W. Nelson, W. Fletcher, Fisher